IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

MARJORIE I. B.,[1]     )
           )
    Plaintiff,    )
           )
v.          )  Case No. 19-cv-797-RJD[2]
           )
COMMISSIONER of SOCIAL SECURITY, )
           )
    Defendant.   )
           )

## MEMORANDUM AND ORDER

**DALY, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), Plaintiff, represented by counsel, seeks judicial review of the final agency decision denying her application for Disability Insurance Benefits (DIB) pursuant to 42 U.S.C. § 423.

## Procedural History

Plaintiff first applied for disability benefits in September 2010, originally alleging disability as of December 9, 2007. (Tr. 136). She later amended her alleged onset date to August 14, 2008. (Tr. 107). After holding an evidentiary hearing, an ALJ issued a partially favorable decision on July 27, 2012, finding Plaintiff disabled as of February 5, 2010, but not before. The timeframe at issue became August 14, 2008, through February 4, 2010, for the rest of the proceedings. (Tr. 13-23). The Appeals Council denied review. (Tr. 1). Plaintiff then filed a complaint in this Court, and this Court found for Plaintiff in January 2014. (Tr. 777-798). The

---

[1] In keeping with the court's practice, Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. See, Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.

[2] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. §636(c). See, Docs. 12 & 23.

ALJ held another evidentiary hearing and issued an unfavorable decision on September 2, 2015. (Tr. 817-830). The Appeals Council granted review and remanded the decision back to the ALJ. (Tr. 1056-1057).

A third evidentiary hearing was held, and on October 11, 2016, the ALJ found Plaintiff was not disabled from August 14, 2008, to February 4, 2010. (Tr. 705-720). The Appeals Council denied review. (Tr. 695-698). Plaintiff then filed a complaint in this Court, and this Court remanded back to the ALJ on June 19, 2018, directing the ALJ to discuss both supportive and undermining evidence. (Tr. 1160-1185). After holding an evidentiary hearing on February 27, 2019, the ALJ issued an unfavorable disability decision on April 3, 2019. (Tr. 1056-1057). Sixty-one days later, this became the final decision on June 3, 2019. This action was timely filed on July 23, 2019. (Doc. 1). Administrative remedies have been exhausted and a timely complaint was filed in this Court.

## Issues Raised by Plaintiff

Plaintiff raises the following points:

1. The ALJ erred by failing to address important evidence that contradicts his finding that Plaintiff was not disabled prior to February 5, 2010.
2. The ALJ erred by finding Plaintiff's statements about the intensity, persistence, and limiting effects of her symptoms are not entirely consistent with the medical evidence and other evidence.
3. The ALJ erred in his analysis of the opinion evidence.

## Applicable Legal Standards

To qualify for DIB, a claimant must be disabled within the meaning of the applicable statutes. Under the Social Security Act, a person is disabled if she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a).

To determine whether a plaintiff is disabled, the ALJ considers the following five questions in order: (1) Is the plaintiff presently unemployed? (2) Does the plaintiff have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the plaintiff unable to perform her former occupation? and (5) Is the plaintiff unable to perform any other work?  20 C.F.R. § 404.1520.

An affirmative answer at either step three or step five leads to a finding that the plaintiff is disabled.  A negative answer at any step, other than at step three, precludes a finding of disability.  The plaintiff bears the burden of proof at steps one through four.  Once the plaintiff shows an inability to perform past work, the burden then shifts to the Commissioner to show that there are jobs existing in significant numbers in the national economy which plaintiff can perform. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

It is important to recognize that the scope of review is limited.  "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g).  Thus, this Court must determine not whether Plaintiff was, in fact, disabled at the relevant time but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made.  *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003).  The Supreme Court's definition of substantial evidence is, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ.  *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019).  However, while judicial review is deferential, it is not abject; this Court

does not act as a rubber stamp for the Commissioner. See, *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

## The Decision of the ALJ

The ALJ followed the five-step analytical framework described above. He determined that Plaintiff had not worked at the level of substantial gainful activity between August 14, 2008, the amended alleged onset date, through February 4, 2010, or through her date last insured of December 31, 2012.

Regarding the period of August 14, 2008 through February 4, 2010, the ALJ found that Plaintiff had severe impairments of lumbar degenerative disc disease with L5-S1 disc herniation, status-post fusion, and obesity.

The ALJ found that, from August 14, 2008 through February 4, 2010, Plaintiff had the residual functional capacity (RFC) to perform light work, except she could stand and/or walk at least two hours in an eight hour work day; she could occasionally climb ladders, ropes, or scaffolds; and she could occasionally stoop, kneel, crouch, and crawl.

Based on the testimony of a vocational expert (VE), the ALJ concluded that, from August 14, 2008, to February 4, 2010, Plaintiff was unable to perform any past relevant work, yet concluded there are jobs that exist in significant numbers in the national economy that Plaintiff could have performed.

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to Plaintiff's arguments.

1. **Agency Forms**

Plaintiff was born in 1964 and was fifty-five years old on the date of the ALJ's decision. (Tr. 134). Her amended alleged onset date is August 14, 2008. Plaintiff worked as a cook at a nursing home from 1995 to 2007 and as a cook at a jail from 2000 to 2004. (Tr. 147).

Plaintiff said she has difficulties bending down, sitting, getting up, doing the dishes, making meals, doing the laundry, walking, and doing housework. Plaintiff said her conditions affect her sleep and personal care. Plaintiff said her hobbies include watching television and watching other people walking and having a good time. Regarding Plaintiff's social activities, she said she spends a lot of time on the phone. Plaintiff said her conditions affect her lifting, squatting, bending, standing, reaching, walking, sitting, stair climbing, and completing tasks. She said she can only walk twenty to twenty-five steps before stopping to rest for a couple minutes and uses a cane all the time. (Tr. 167-174).

2. **Evidentiary Hearing**

The most recent evidentiary hearing occurred in February 2019. (Tr. 1086). However, it did not involve any testimony by Plaintiff. Therefore, Plaintiff's testimony from the July 2012 evidentiary hearing will be restated here.

An attorney represented Plaintiff at the evidentiary hearing on July 9, 2012. (Tr. 31). She was forty-eight years old at the hearing, unmarried, and lived at home alone. She had two sons and five grandchildren. She could no longer babysit her grandchildren due to her back problems, but they visited her occasionally. (Tr. 34-36).

She last worked as a head cook in a nursing home, where she worked for twelve years before injuring her back on the job when she slipped on water and caught herself during the fall which caused her to rupture her back. She initially attempted to return to work but was unable to

do so. Plaintiff received workers' compensation benefits for her injury until 2011 when she received a settlement of approximately $150,000. (Tr. 37-40).

After her injury, Plaintiff testified that she was confined to her recliner or bed most of the day due to pain in her back and legs. She had not sought work elsewhere. In June 2009, Plaintiff stated that she had surgery where two rods, two discs, six screws, and parts of her hip bone were placed in her back. The surgery relieved some leg pain, but her back pain remained the same. (Tr. 41-42). Plaintiff attempted rehab and was doing well until she injured her back further while carrying weights at therapy. Thereafter, her doctors had her discontinue physical therapy. (Tr. 44-45).

Plaintiff testified that she spends most of her time laying down or in a recliner with her feet propped up. She made tea and TV dinners, but she had to sit down halfway through making either so that she could get pressure off her back. If she attempted to do dishes, she rested her elbows on the counter to relieve some of the pressure. (Tr. 43-44). She testified that it took her all day to perform typical tasks because she had to frequently stop and rest. (Tr. 47).

A vocational expert (VE) also testified. The VE testified that Plaintiff's past work as a cook was classified as medium skilled work. The ALJ asked the VE a hypothetical where she was to assume a person with Plaintiff's vocational and educational background and could perform light work, but the person could only stand or walk for two hours in an eight-hour workday. Additionally, the person could only occasionally climb ladders, ropes, scaffolds, stoop, kneel, crouch, or crawl. The VE testified that this person could perform jobs with a restricted range of sedentary work that exist in a significant number in the national economy. Examples of such jobs are clerical addresser, security monitor, and small products sorter. (Tr. 49-50).

The VE testified that if the person could not tolerate eight hours of work a day, five days a

week, on a consistent basis and required unscheduled absences and breaks at will, no jobs existed in the national or regional economies. (Tr. 50-51).

3.    **Relevant Medical Records**

Because the time period at issue is from August 14, 2008, to February 4, 2010, only those medical records will be included here. Some potentially important studies or scans recorded after this time period may be included.

Plaintiff presented to Carol Weiler, a physician assistant, at West Salem Medical Clinic Family Practice ten times between July 2007 and September 2007. (Tr. 377-383, 528). During this time, Plaintiff reported injuring her back at work when she tried catching herself before falling to the floor and twisting her back on the way down, and she reported reinjuring her back on August 14, 2007. (Tr. 379, 383). Plaintiff reported pain at a six out of ten, doing better with medications at times, having continual pain, having to sit down a few times before finishing chores, back tension, working only four to six hours a day at times, and lack of improvement. (Tr. 379-383, 528). PA Weiler noted Plaintiff had paravertebral tightness bilaterally with spasms, guarded and intact range of motion, unguarded gait, negative straight leg raise tests with one positive straight leg raise test, spine pain on palpation, better movement at times, decreased tightness at times, and better ambulation. The assessment included back pain/strain. Plans included medication, applying heat before work and ice after work, undergoing an MRI, and work restrictions such as refraining from work, returning to work for no more than four hours a day, working no more than six hours a day, and lifting no more than twenty pounds. (Tr. 377-383, 528).

On August 15, 2007, Plaintiff presented to Richland Memorial Hospital complaining of low back pain and stating she fell and hurt her back at work on July 17. (Tr. 230). Plaintiff said her pain started the day prior when she bent down to pick something up, her pain worsens when

standing or walking, her pain medications were not helping, and she tried ice and a heating pad. (Tr. 233). She was given medications, had significant improvement, and was discharged. (Tr. 235).

Plaintiff presented to Richland Memorial Hospital on October 4, 2007. Her diagnosis was chronic low back pain, she was given Dilaudid, and was instructed to stay off work for three days, refrain from heavy lifting, and rest. (Tr. 238-239).

Plaintiff presented to an orthopedic surgeon, Lawrence Leventhal, in October 2007 complaining of low back pain at a four out of ten when resting and an eight out of ten when active. The pain worsened when pulling, standing, trying to get comfortable in bed, and walking. She had a negative straight leg raise bilaterally and x-rays were performed of her lumbar spine. The x-ray impression was, "Advanced degenerative discs of the lumbar spine with a degenerative spondylolisthesis[3] at L4-5, grade 2." Dr. Levanthal reviewed an MRI performed on September 7, 2007, and the impression was, "Degenerative spondylolisthesis at L4-5 with advanced degenerative disc at this level." Dr. Leventhal diagnosed lumbago, prescribed physical therapy and recommended suitable levels of work activity. Dr. Leventhal issued a work release that recommended Plaintiff be off work for six weeks. (Tr. 240-245).

Plaintiff participated in over twenty physical therapy appointments at Richland Memorial Hospital between October 2007 and January 2008. (Tr. 246-249, 257-258, 617-618, 621-624, 627-629). Plaintiff rated her pain anywhere from a two out of ten to a six out of ten. (Tr. 246, 249, 621-624, 627-629). Plaintiff reported some soreness, improvement, continual pain, muscle spasms after working for five hours, and stiffness. (Tr. 249, 258, 617-618, 621-624, 627-628). PT McLaughlin recommended Plaintiff return two to three times a week for four to six weeks. (Tr.

---

[3] Spondylolisthesis refers to, "Forward displacement of one of the lower lumbar vertebrae over the vertebra below it or on the sacrum." https://medical-dictionary.thefreedictionary.com/spondylolisthesis, visited on March 27, 2020.

247-248, 252-253).

Plaintiff presented to Dr. Leventhal seven times between November 2007 and May 2008. (Tr. 254, 260, 265, 270, 272, 277, 279). Plaintiff reported injuring her back on December 8, 2007, when bending over to pick up empty pans, and she went to the emergency room two days later. (Tr. 260, 657). Plaintiff reported successful physical therapy appointments, continual pain that improved with physical therapy and medications but also worsened at times, low back pain anywhere from a one out of ten to a seven out of ten, and decreased pain with heat, sitting, rest, and medications. (Tr. 254, 260, 265, 270, 272, 280). Plaintiff underwent two injections in December 2007, was off work for five days, and said her pain decreased thanks to the injections. (Tr. 260, 270, 272). Plaintiff received another injection which did not help her pain and symptoms. (Tr. 268, 277). Plaintiff reported abstaining from work and said light work was not available. (Tr. 280). Dr. Leventhal noted both positive and negative straight leg raise tests, full flexion and extension at times, both thirty and fifty percent flexion at times, and tenderness to palpation. (Tr. 261, 266, 270-271, 273, 278-279). An x-ray showed spurring and ankylosis[4] anteriorly secondary to some arthritis. (Tr. 263). Diagnoses included lumbago, sciatica, and spinal stenosis[5] of the lumbar region. (Tr. 255, 261, 266, 271, 273, 278). Plans included physical therapy, steroid injections, refraining from work at times, and later returning to work full time, if available, with restrictions including light work and lifting no more than twenty pounds. (Tr. 255, 261, 264, 266, 269, 271, 273-274, 276, 279). Dr. Leventhal also recommended surgery if strengthening Plaintiff's back fails to help. (Tr. 276).

---

[4] Ankylosis refers to, "immobility and consolidation of a joint due to disease, injury, or surgical procedure." https://medical-dictionary.thefreedictionary.com/ankylosis, visited on March 27, 2020.
[5] Stenosis, regarding the spine, refers to, "narrowing of the vertebral canal, nerve root canals, or intervertebral foramina of the lumbar spine, caused by encroachment of bone upon the space; symptoms are caused by compression of the cauda equina and include pain, paresthesias, and neurogenic claudication." https://medical-dictionary.thefreedictionary.com/stenosis, visited on March 27, 2020.

Plaintiff presented to Keith Wilkey, an orthopedic surgeon, on April 3, 2008, and underwent an independent medical evaluation for a third party regarding a worker's compensation claim concerning Plaintiff's back injury. Plaintiff reported pain at a four out of ten and reporting the ability to return to some light work. Dr. Wilkey noted tenderness to palpation at Plaintiff's low back but no sacroiliac joint or leg pain. The assessment included, "Grade I spondylolisthesis L4-5-subacute exacerbation." Plaintiff mentioned wanting to work, and Dr. Wilkey recommended Plaintiff continue with epidural injections and viewed Plaintiff as potentially a good candidate for surgical intervention. Dr. Wilkey said Plaintiff could return to work but should be restricted to lifting only 20 pounds or less, and should bend, twist, and stand as tolerated. (Tr. 343-345).

Plaintiff underwent physical therapy at Richland Memorial Hospital fifteen times between May 2008 through July 2008. Plaintiff said she had been off work since October 2007 apart from a brief period of returning to work. Plaintiff rated her pain anywhere from a three out of ten to a seven out of ten. (Tr. 282-286, 636). Plaintiff reported taking several pain pills, muscle spasms, stiffness, occasionally feeling better, and deficits in sleeping, working, bending, lifting, prolonged walking, sitting, and standing. (Tr. 282, 285, 636). The physical therapist noted minimal pain change, slow, guarded movements, inability to achieve pelvic tilt due to pain, and increased pain. (Tr. 282-285). Plans included continuing physical therapy and home exercises. (Tr. 282). The physical therapist sent letters to Dr. Leventhal throughout treatment saying Plaintiff complied and had some slow but good progress. The physical therapist did not feel Plaintiff could return to work and wanted to continue seeing her. (Tr. 288, 637).

Plaintiff presented to Dr. Leventhal six times between June 2008 and October 2008. Plaintiff reported unchanged, decreased and severe pain, decreased muscle spasms, pain without relief, pain with walking, an inability to get comfortable in bed, improvement with physical

therapy, popping sensations in her back while walking, wobbling, problems sleeping, and restlessness. (Tr. 290, 293, 299, 304, 307, 313). Plaintiff rated her pain between a zero to six out of ten and said she was considering back surgery. (Tr. 290, 299, 304, 307, 313). Dr. Leventhal noted tenderness to palpation, fifty percent of normal flexion, full flexion, eighty percent of normal extension, full extension, and both positive and negative straight leg raise tests. (Tr. 291, 294, 300, 305, 308, 314). Dr. Leventhal noted Plaintiff made a good faith effort in physical therapy despite hitting a plateau in her results. (Tr. 310). An x-ray showed, "Significant instability at the L4-5 level." (Tr. 311). Diagnoses included lumbago, and clinical impressions included low back pain improving with therapy and aquatherapy and "Bilateral pars defect at L4-5 with grade 2 spondylolisthesis." Recommendations included a fusion at the L4-5 level, and plans included refraining from work until reevaluation, continuing physical therapy, referral to a tertiary center, and discharge from further active orthopedic care. (Tr. 289, 291-292, 298, 300, 303, 305, 308, 310, 312, 315-316).

Plaintiff presented to West Salem Medical Clinic Family Practice on October 21, 2008, reporting increased back pain at a four out of ten. The assessment included back pain due to spondylolisthesis L4-L5. (Tr. 374).

Plaintiff underwent an MRI of her lumbar spine on November 11, 2008, and the conclusion was, "1. Chronic bilateral L4 spondylolysis and grade 1 anterior spondylolisthesis of L4 on L5 and associated degenerative disc disease and facet arthropathy producing moderate L4-5 foraminal stenosis. 2. Broad left-sided L5-S1 disc herniation extending laterally into the left L5-S1 neural foramen. Mild chronic anterior wedge compression fracture T11 with no acute fracture identified." (Tr. 317).

Plaintiff presented to Charles Wetherington, a neurosurgeon, on November 18, 2008,

complaining of lumbar spine symptoms. Plaintiff reported worsened symptoms, said her symptoms worsened with activity, lying down, sitting, standing, and walking, and reported an inability to get any relief. Dr. Wetherington noted Plaintiff tried epidural steroid injections, physical therapy, pool therapy, and analgesics. Dr. Wetherington noted palpation of the lumbar spine revealed significant right-side sacroiliac joint tenderness with some midline spinal tenderness as well and a negative straight leg raise bilaterally. Plans included a right sacroiliac joint injection. (Tr. 318-319).

Plaintiff presented to Brian Ogan, a pain medicine specialist, at the Effingham Ambulatory Surgery Center five times between December 2008 and March 2009. (Tr. 323, 328, 331, 333, 337). Plaintiff reported sitting and resting as her only relief. (Tr. 323). With Dr. Organ, Plaintiff underwent nerve root block and transforaminal injections and had follow-up appointments. (Tr. 323, 326, 331, 335). Plaintiff reported a good amount of improvement after the injections but still had pain, sometimes increased pain, that occurred nearly constantly with ambulation, standing or bending. (Tr. 328, 333, 337). Dr. Ogan noted Plaintiff's lumbar spine was without deformity, the sacroiliac joint was mildly to exquisitely tender to palpation, and leg raises created low back pain. (Tr. 324, 328, 333, 337). His assessment included lumbar nerve root irritation on the right at the L4-5 level and spondylosis. (Tr. 334). Throughout this time period, Dr. Organ often recommended more injections and that Plaintiff refrain from working. (Tr. 324-325, 329, 334, 338). However, at one point, Dr. Ogan recommended not repeating the injection as it did not relieve Plaintiff's pain enough. (Tr. 329).

Plaintiff presented to the West Salem Medical Clinic Family Practice on February 16, 2009, reporting "Doing ok" and having no relief from past sacroiliac injection. Later that month, Plaintiff called and said her insurance refused pay for her medications. (Tr. 373).

Plaintiff presented to Dr. Wilkey nine times between May 2009 and January 2010. (Tr. 339, 346, 348, 350-354). Prior to her surgery in July 2009, Plaintiff reported further injury to her back in June 2009 and often reported pain at a six out of ten. (Tr. 346, 348, 350). Plaintiff reported trouble standing for more than twenty minutes and difficulty walking for more than half a block. Dr. Wilkey noted tenderness and limited range of motion. His assessment included failed conservative care and exacerbation of degenerative spondylolisthesis L4-L5, and recommendations included back surgery due to exhausting all non-operative options. (Tr. 346, 348). Dr. Wilkey believed Plaintiff could return to light work limited to lifting and carrying thirty pounds and bending, twisting, sitting, standing, pushing, pulling, and driving as tolerated. (Tr. 347-350).

Dr. Wilkey performed back surgery on Plaintiff on July 9, 2009, and found unanticipated severe osteoporosis and facet arthropathy at 3-4. (Tr. 339). Plaintiff had no complications, and Dr. Wilkey encouraged Plaintiff to start physical therapy and refrain from working. Plaintiff reported a fifty to seventy percent improvement in her back pain post-surgery and a one hundred percent improvement in leg pain. Her progress eventually plateaued. From July 2009 to January 2010, Dr. Wilkey noted negative straight leg raise tests, improved range of motion, decreased pain in the lower spine, a waddling gait, and soreness. Dr. Wilkey recommended Plaintiff walk, progress as tolerated, and refrain from working, and plans included continuation of physical therapy. Eventually, Dr. Wilkey said Plaintiff could return to work in the near future with restrictions for lifting and carrying up to twenty pounds, working four-hour shifts at maximum, and bending, twisting, sitting, and standing as tolerated. Later, Dr. Wilkey said Plaintiff should pause therapy, continue to simply walk, and potentially return to work with restrictions of lifting and carrying up to thirty pounds and sitting, standing, and twisting as tolerated. (Tr. 351-354).

Plaintiff completed over 40 physical therapy appointments at Richland Memorial Hospital from August 2009 to December 2009. (Tr. 638, 641-645, 647-648, 650-652, 654-656). She presented for status post fusion, back pain, and gait abnormality. (Tr. 638). Plaintiff said her employer was unable to accommodate her necessary restrictions, and she reported muscle spasms, an increase in pain, stiffness, pain with walking, soreness, fatigue, an increase in pain medications, walking one city block, and pain between a five to seven out of ten. (Tr. 638, 641-644, 647-648, 650-652, 654-656). The physical therapists noted guarded movements, slow cadence, decreased stride, strength, and ambulation, a labored and antalgic gait pattern, and decreased stability while standing but also noted steady gains over time. (Tr. 638-639, 641, 645, 650-653, 654-656). At one point, Plaintiff was able to ambulate up and down the stairs once using the handrail and experienced a mild pulling sensation. (Tr. 644). Plaintiff continued to have both occasional improvement and occasional increase in pain. (Tr. 647-648). Plans included decreasing pain, improving strength, and continuing physical therapy. (Tr. 639).

Plaintiff presented to the Richland Memorial Hospital emergency room on February 5, 2010, complaining of back pain with no relief despite taking many pain medications in an effort to dull the pain. The emergency physician noted Plaintiff did not show any clinical evidence of disc signs or muscle atrophy, and Plaintiff received an injection and pain medications. (Tr. 659).

In June 2010, Dr. Wilkey said a CT scan on Plaintiff's back in February showed, "maturation of the fusion both posterolateral and interbody. Due to her large size, this will probably need to be repeated." (Tr. 356). Plaintiff underwent a CT scan of her lumbar spine on June 28, 2010. The impression was, "No CT evidence of acute lumbar spine fracture or subluxation…No orthopedic hardware loosening or breakage is appreciated. There is a grade 1 anterolisthesis[6] of

_____

[6] Anterolisthesis refers to, "Forward displacement of a vertebral body with respect to the vertebral body immediately below it, due to congenital anomaly, degenerative change, or trauma." https://medical-

L4 on L5 present. Mild to moderate neural foraminal encroachment may be present at L3-L4 and L5-S1." (Tr. 360-361).

On September 23, 2010, Dr. Wilkey reviewed a recent CT scan and said, "It was an excellent study that shows a healed posterior lateral fusion bilaterally, as well as solid interbody fusion. No evidence of hardware failure or loosening." Dr. Wilkey recommended Plaintiff only lift and carry up to thirty pounds and bend, twist, sit, stand, and drive as tolerated. (Tr. 357).

### 4. Medical Opinions

State agency physician B. Rock Oh, M.D. assessed Plaintiff's RFC in January 2011. (Tr. 501-507). He reviewed medical records but did not examine Plaintiff. He believed Plaintiff could occasionally lift twenty pounds and frequently lift ten pounds. He opined Plaintiff could stand or walk for a total of two hours in an eight-hour workday and sit for a total of six hours in an eight-hour workday. (Tr. 501). He limited Plaintiff to occasional climbing of ladders, ropes, and scaffolds, and occasional stooping, kneeling, and crouching. (Tr. 502).

Dr. Lenore Gonzalez, M.D., of Disability Determination Services (DDS) agreed with this opinion in April 2011. (Tr. 518-520).

<u>Analysis</u>

First, Plaintiff asserts the ALJ erred by failing to address important evidence that contradicts his finding that Plaintiff was not disabled prior to February 5, 2010.

The Seventh Circuit has "repeatedly held that although an ALJ does not need to discuss every piece of evidence in the record, the ALJ may not analyze only the evidence supporting her ultimate conclusion while ignoring the evidence that undermines it." *Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014). The ALJ must consider all relevant evidence. *Golembiewski v.*

---

dictionary.thefreedictionary.com/anterolisthesis, visited on March 27, 2020.

*Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003); 20 C.F.R. § 404.1545 (a)(1) and (3). Moreover, the ALJ must "engage sufficiently" with the medical evidence. *Stage v. Colvin*, 812 F.3d 1121, 1125 (7th Cir. 2016). The ALJ "need not provide a complete written evaluation of every piece of testimony and evidence." *Curvin v. Colvin*, 778 F.3d 645, 651 (7th Cir. 2015) (citation and internal quotations omitted). However, the ALJ's discussion of the evidence must be sufficient to "provide a 'logical bridge' between the evidence and his conclusions." *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009), internal citations omitted. The ALJ "cannot simply cherry-pick facts supporting a finding of non-disability while ignoring evidence that points to a disability finding." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010).

Plaintiff argues the ALJ skimmed over the physical therapy records and believes the ALJ erred in saying Plaintiff "was able to ambulate up and down stairs."

This Court agrees that the ALJ seemed to assume Plaintiff was continuously able to ambulate up and down stairs. However, that was not the case. There was only one mention of Plaintiff successfully ambulating stairs in September 2009, and she did so while using the handrail. This did not come without pain as Plaintiff reported a pulling sensation in her back. (Tr. 644). Therefore, it is incorrect for the ALJ to generalize this as if Plaintiff always had the ability to ambulate stairs, and this error has the potential to affect the disability decision.

Furthermore, there are multiple medical records regarding Plaintiff's back pain and physical therapy appointments that provide, in detail, Plaintiff's improvement, complaints, objective findings, and more. There were multiple references in the medical records indicative of back issues such as an antalgic gait, issues with standing and walking, tenderness to palpation, decreased flexion and extension, and more. In his decision, the ALJ continually highlighted Plaintiff's normal neurological examinations and negative straight leg raise tests among other

things when, in fact, there were other objective findings worthy of considering. The ALJ said Plaintiff's examination findings were "usually mild, although she sometimes had [a] positive straight leg raise and of course had some range of motion limitations." (Tr. 1072). To say that Plaintiff's examination findings were usually mild is incorrect. One cannot correctly consider an individual's back pain examinations "mild" when doctors considered the individual to have exhausted all non-operative options and that back pain required multiple injections, numerous hours of physical therapy, and ultimately back surgery. Although the ALJ did not ignore the objective evidence in its entirety, it is clear that the ALJ's decision did not adequately reflect the plentiful number of objective findings and instead focused more on Plaintiff's subjective complaints.

Defendant argues that the ALJ did not ignore certain medical evidence. However, what Defendant fails to address is how the ALJ may not have engaged sufficiently with the medical evidence, which is what happened here. With that said, this Court agrees the ALJ did not adequately consider all medical records.

Second, Plaintiff asserts the ALJ erred by finding Plaintiff's statements about the intensity, persistence, and limiting effects of her symptoms are not entirely consistent with the medical evidence and other evidence. Although the ALJ considered a variety of factors in his analysis, his credibility determination cannot be upheld.

SSR 16-3p supersedes the previous SSR on assessing the reliability of a claimant's subjective statements. SSR 16-3p became effective on March 28, 2016 and is applicable here. 2017 WL 5180304, at *1. The new SSR eliminates the use of the term "credibility," and clarifies that symptom evaluation is "not an examination of an individual's character." SSR 16-3p continues to require the ALJ to consider the factors set forth in the applicable regulation, 20 C.F.R.

§ 404.1529.  Ibid. at *10.

The new SSR does not purport to change the standard for evaluating the claimant's allegations regarding her symptoms.  Thus, prior Seventh Circuit precedents continue to apply.

The findings of the ALJ as to the accuracy of the plaintiff's allegations are to be accorded deference, particularly in view of the ALJ's opportunity to observe the witness.  *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000).  However, Social Security regulations and Seventh Circuit cases "taken together, require an ALJ to articulate specific reasons for discounting a claimant's testimony as being less than credible, and preclude an ALJ from 'merely ignoring' the testimony or relying solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a negative credibility finding."  *Schmidt v. Barnhart*, 395 F.3d 737, 746-747 (7th Cir. 2005), and cases cited therein.

Plaintiff argues that the ALJ erred by using a more rigorous standard when deciding whether Plaintiff's statements were "entirely consistent with the medical evidence and other evidence."  Plaintiff said the correct standard is whether the allegations "can reasonably be accepted as consistent with the objective evidence and other evidence."  However, the ALJ's use of this language is harmless where the ALJ goes on to give his reasons for his decision.  *Burmester*, 920 F.3d at 510.  The use of the phrase "not entirely consistent" does not suggest that the ALJ used an incorrect standard.  The ALJ cited the correct standard at Tr. 1061 and discussed the relevant factors in assessing Plaintiff's allegations.

The ALJ's error in Plaintiff's first issue consequently affects this credibility issue.  Had the ALJ adequately weighed the objective evidence with Plaintiff's subjective complaints, there would be a fairer understanding as to whether Plaintiff's complaints are supported by the record as a whole.  Furthermore, in a recent Seventh Circuit decision discussion about credibility, the court

said the problem lies where the ALJ cites only to evidence in favor of their decision and fails to discuss the conflicting evidence. *Reinaas v. Saul*, No. 19-1985, --- F.3d ---, 2020 WL 1242431, at *5 (7th Cir. Mar. 16, 2020).

Here, the ALJ said Plaintiff's statements about the intensity, persistence, and limiting effect of her symptoms were "inconsistent because her report varied over the relevant period…" (Tr. 1072). It is true that Plaintiff's reports varied. Nevertheless, this is expected when an individual such as Plaintiff undergoes a large number of physical therapy appointments, multiple injections, and back surgery. Therefore, it is incorrect to assume that Plaintiff would be more credible had her reports stayed the same throughout multiple methods of treatment. As for the objective medical evidence that supports Plaintiff's complaints, this Court's response as to Plaintiff's first issue applies here. With that said, the ALJ's lack of discussion involving the objective evidence consequently casts an unfair light on the reliability of Plaintiff's subjective complaints.

Lastly, Plaintiff asserts the ALJ erred in his analysis of the opinion evidence.

"An ALJ can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice." *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). A consultative examiner is not entitled to controlling weight because the examiner is not the claimant's treating physician. *Simila v. Astrue*, 573 F.3d 503, 514 (7th Cir. 2009). On the other hand, the treating physician's opinion, although important, is not the final word. *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996)(internal citation omitted). A treating source's medical opinion is entitled to controlling weight only where it is supported by medical findings and is not inconsistent with other substantial evidence in the record. *Brown v. Colvin*, 845 F.3d 247, 252 (7th Cir. 2016), citing *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000). If given less weight, an ALJ must articulate their reasons

for giving the treating physician's opinion less weight. *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011); *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008); *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004). Since non-examining medical professionals are not engaged in a treating relationship with the claimant, federal regulations state:

> …the weight we will give their medical opinions will depend on the degree to which they provide supporting explanations for their medical opinions. We will evaluate the degree to which these medical opinions consider all of the pertinent evidence in your claim, including medical opinions of treating and other examining sources.

20 C.F.R. § 404.1527(c)(3).

Plaintiff argues that the state agency non-examining physicians did not adequately articulate their reasoning for their medical opinions regarding Plaintiff's medical impairments and any articulation by the state agency non-examining physicians only regarded medical records on February 5, 2010, or after. Plaintiff, therefore, argues the ALJ erred by giving substantial weight to those opinions. Additionally, Plaintiff argues that Dr. Wilkey's opinions from April 3, 2008, May 5, 2009, June 2, 2009, and January 12, 2020, regarding Plaintiff returning to work are not distinguishable from Dr. Wilkey's opinions given after February 5, 2010.

Defendant argues the ALJ did an adequate job articulating why he gave Dr. Oh and Dr. Gonzalez's opinions substantial weight. However, the ALJ's articulation is not at issue here. The lack of articulation by Dr. Oh and Dr. Gonzalez is at issue. These January 20, 2011, and April 8, 2011 opinions, of course, occurred after February 5, 2010. They were very brief with very minimal citation or reference to records prior to February 5, 2010. These opinions did not include the level of supporting explanation as required by § 404.1527(c)(3). Therefore, the ALJ erred by giving said opinions such substantial weight.

Dr. Wilkey gave work limitations on April 3, 2008, May 5, 2009, June 2, 2009, January

12, 2010, and September 23, 2010. Dr. Wilkey's recommendations consisted of light work, lifting and carrying up to twenty to thirty pounds, and bending, twisting, sitting, standing, pushing, pulling, and driving as tolerated. Plaintiff argues that the April 2008, May 2009, June 2009, and January 2010 limitations are no different than the September 2010 limitations, which came well after February 5, 2010, when Plaintiff became disabled. This Court agrees.

Instead of better explaining this issue, the ALJ argues how the previous decision of this Court was incorrect on this topic. The ALJ continued saying, "…as of February 2010, the claimant's pain increased so much that her pain meds did not control the pain…thus supporting that while she could still do the range of light work, her pain levels became so severe that added limitations regarding staying on task and completing workdays became warranted." (Tr. 1065). What the ALJ fails to mention is Plaintiff had these issues with her medications long before February 5, 2010.

On December 1, 2009, Dr. Wilkey recommended Plaintiff only work four-hour shifts. The Seventh Circuit has also noted that, "a person who cannot work eight hours a day, five days a week, or the equivalent, is disabled." *Roddy v. Astrue,* 705 F.3d 631, 636 (7th Cir. 2013). The ALJ believed this limitation seemed to be temporary as Dr. Wilkey said Plaintiff could return to work in the near future. More specifically, Dr. Wilke said, "I see no reason that she cannot return to work shortly." (Tr. 353). However, Dr. Wilkey did not specifically state in his notes that Plaintiff could return to working more than four-hour shifts in the near future. Therefore, it is incorrect to assume that Dr. Wilkey's indication was that Plaintiff could return to work with a more normal schedule as opposed to being limited to four-hour shifts. Since the ALJ relied heavily on Dr. Wilkey's work restrictions, he could have explained why Plaintiff was not disabled in spite of this. Instead, the ALJ made a broad generalization and speculated as to what Dr. Wilkey meant.

This is error.

An ALJ's decision must be supported by substantial evidence, and the ALJ's discussion of the evidence must be sufficient to "provide a 'logical bridge' between the evidence and his conclusions." *Terry*, 580 F.3d at 475, internal citations omitted. Here, the aforementioned errors leave a gap in the ALJ's decision. Therefore, the Court must conclude that the ALJ failed to build the requisite logical bridge here.

This Memorandum and Order should not be construed as an indication that the Court believes Plaintiff was disabled during the relevant period or that she should be awarded benefits. On the contrary, the Court has not formed any opinions in that regard and leaves those issues to be determined by the Commissioner after further proceedings.

<u>**Conclusion**</u>

The Commissioner's final decision denying Plaintiff's application for social security disability benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. §405(g).

The Clerk of Court is directed to enter judgment in favor of Plaintiff.

**IT IS SO ORDERED.**

**DATED: April 1, 2020**

*s/ Reona J. Daly*
**Hon. Reona J. Daly**
**United States Magistrate Judge**